CLEVELAND BAR ASSOCIATION *v.* GLASSMAN.

[Cite as *Cleveland Bar Assn. v. Glassman,*
104 Ohio St.3d 484, 2004-Ohio-6771.]

(No. 2004–1090—Submitted August 17, 2004—Decided December 17, 2004.)

---

**Per Curiam.**

{¶ 1} Respondent, Mark P. Glassman of Pepper Pike, Ohio, Attorney Registration No. 0029226, was admitted to the practice of law in Ohio in 1977. On September 26, 2003, relator, Cleveland Bar Association, filed an amended complaint charging respondent with five counts of professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of misconduct, which the board adopted, and a recommendation, which the board modified.

{¶ 2} In preliminary proceedings following the filing of the original complaint, the parties filed a consent-to-discipline agreement pursuant to Section 11 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In reviewing the agreement, the panel learned that respondent had been convicted of two felonies in 1994. Nonetheless, no ensuing disciplinary proceedings pursuant to Gov.Bar R. V(5)(A) (interim suspension upon notice of an attorney's felony conviction) had been undertaken. The panel then rejected the consent-to-discipline agreement, and relator amended its complaint to include a fifth count alleging the felony convictions.

{¶ 3} On November 21, 2003, we suspended respondent from the practice of law pursuant to Gov.Bar R. V(5)(A)(4). See *In re Glassman,* 100 Ohio St.3d 1492, 2003-Ohio-6184, 799 N.E.2d 174.

{¶ 4} Notice to this court of respondent's convictions may have been delayed, according to relator, by a November 1994 change in relator's counsel and the transition before hiring a successor in the fall of 1995. A certified judgment entry of respondent's convictions, dated November 9, 1994, had been on file with relator during this time; however, the judgment entry apparently "fell through the cracks." As a result, relator's counsel initially attempted, with respondent's former counsel's permission, to report respondent's felonies by including them as an aggravating feature of respondent's case in the consent-to-discipline agreement.

### Misconduct

{¶ 5} Except for Count V, which alleged a violation of Gov.Bar R. V(4)(G) (failure to cooperate in an investigation of misconduct), the parties stipulated to the facts and misconduct charged in the amended complaint. Respondent thus

admitted and the panel found violations of DR 1–102(A)(4) (barring an attorney from conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (barring conduct prejudicial to the administration of justice), 1–102(A)(6) (barring conduct that adversely reflects on the attorney's fitness to practice law), 6–101(A)(3) (prohibiting an attorney's neglect of an entrusted legal matter), 7–101(A)(1) (requiring an attorney to seek the client's lawful objective through reasonable and lawful means), and 7–101(A)(2) (requiring an attorney to carry out a contract for professional employment). The panel, on the parties' stipulation, subsequently dismissed Count V.

{¶ 6} The board adopted these findings of misconduct, all of which emanated either from respondent's representation of Sheri Basile or the events underlying his two felony convictions.

### The Basile Grievance

{¶ 7} Basile engaged respondent in November 1999 to file a bankruptcy petition. She paid him $925, including a $175 filing fee and $750 for preparing and filing the bankruptcy petition and covering "the first meeting of creditors/hearings." By August 2000, however, respondent still had not confirmed to his client that he had filed the bankruptcy on her behalf. As a result, Basile telephoned respondent on August 18, 24, 28, and 29, 2000, October 9, 10, 13, and 18, 2000, and November 8, 17, and 22, 2000. Respondent did not return any of these calls.

{¶ 8} On December 4, 2000, Basile's boyfriend called respondent and told him that he had alerted local television stations and a state senator about respondent's failure to file Basile's bankruptcy petition. In August 2001, another attorney called respondent about Basile. On October 31, 2001, Basile's cousin called and urged respondent to call Basile. Respondent also received a letter inquiring about Basile's case from a Cleveland television station.

{¶ 9} Despite all these efforts, respondent never contacted Basile and never filed her bankruptcy petition. Moreover, while being deposed by relator, respondent denied, purportedly after reviewing records of his telephone messages, that Basile had tried to contact him "after * * * the first quarter of the year 2000." Respondent also denied having received calls from or having spoken with Basile's boyfriend. In addition, respondent attested that he did not call Basile on his own because he did not know that he had an accurate telephone number for her at the time, adding "I had her number in 1999 and 2000. I lost track of where Ms. Basile was."

{¶ 10} Basile, however, had the same telephone number and address throughout the period of respondent's representation. Moreover, respondent produced subpoenaed message slips that contained phone numbers at which Basile could be

reached. And to further contradict his deposition testimony, respondent testified before the panel that he did return Basile's messages, albeit only for the first month of her calls. Later, he testified that he had just ignored Basile's calls.

## The Felony Convictions

{¶ 11} In 1994, respondent pleaded guilty to two counts of grand theft in violation of R.C. 2913.02. Both convictions involved respondent's theft of funds paid in settlement by an insurance carrier for the benefit of injured clients. During 1989 and 1990, respondent forged at least two clients' signatures on checks and kept much of the money. On September 30, 1994, respondent was sentenced to one year in prison for each of his crimes; however, his sentence was suspended, and he was placed on probation for six months. Respondent was also ordered to pay restitution, continue with medical treatment for his sleep disorder, and work 50 hours for an attorney-referral service.

## Sanction

{¶ 12} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating circumstances to which the parties also stipulated. These included the fact that respondent had no prior record of having violated the Code of Professional Responsibility, BCGD Proc.Reg. 10(B)(1)(a). Respondent had, however, been sanctioned by the United States Bankruptcy Court for "flagrant abuse" of the bankruptcy system. In testimony, respondent explained that he had filed the case related to that sanction as a partner in a financially troubled family business. Respondent added that he was sanctioned at about the time that the dispute arose over the funds that he was later convicted of stealing.

{¶ 13} The board further found, based on the panel report, that respondent had acted with a dishonest or selfish purpose, that he had committed multiple offenses, and that a pattern of misconduct existed. BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). Moreover, the board was not completely satisfied that respondent had acknowledged the wrongfulness of his conduct, BCGD Proc.Reg. (10)(B)(1)(g), finding that although he claimed to take responsibility for his transgressions, he sometimes suggested that others were also at fault.

{¶ 14} Respondent in particular rationalized his responsibility for the events underlying his convictions. Respondent represented three clients in the personal injury action that produced the insurance proceeds that respondent kept. These clients, Cynthia Spoden, Tammy Walters, and Mahmoud Al–Jamal, were injured in an automobile accident. During the pendency of this action, respondent defended Spoden's son, also Walters's fiancé, against a felony charge, and Spoden and Walters had apparently pledged proceeds from the personal injury suit toward respondent's fees in the criminal case. Respondent charged $100 per hour and estimated that he devoted 80 hours to the son's defense; however,

Spoden and Walters refused to pay when asked. Respondent in turn decided to retain the legal fees in question from the settlement proceeds, and he did so over his clients' objections.

{¶ 15} Spoden's share of the proceeds would have approximated $7,000, Walters would have received around $2,000, and Al–Jamal was apparently entitled to about $400, although Al–Jamal's share is not implicated in respondent's convictions. Regardless, respondent negotiated the insurance check and converted some of the sum to fees. Respondent told the panel that he had resorted to "self-help" in applying proceeds of the personal injury case to the criminal case, adding that he was "indicted for that self-help act." In other words, respondent kept the money because he thought he was entitled to it as payment for the criminal defense case.

{¶ 16} As to his conduct toward Spoden and Walters, respondent expressed regret, but he did not offer a full apology, explaining:

{¶ 17} "I conducted myself * * * in a very haphazard and sloppy manner * * *.

{¶ 18} "* * *

{¶ 19} "I certainly could have conducted myself in a more efficacious manner. I didn't do so, and I admitted to that. I signed those checks and applied those funds and admitted to that act. I would not say that I did anything wrong. I represented those people to the best of my ability, but after that, I did not conduct myself in a professional manner in any way, shape or form. I don't want to give the impression that I think I did nothing wrong here."

{¶ 20} As to his conduct toward Basile, respondent acknowledged: "I probably took a very lackadaisical approach toward that bankruptcy in retrospect." And after offering inconsistent explanations for his neglect of her interests, respondent conceded that he had actually just ignored Basile's calls, offering no explanation for doing so. In conclusion, respondent recapitulated:

{¶ 21} "I certainly don't want to give the impression here that I'm sitting here thinking that I have done nothing wrong. I'm consummately culpable in both of these cases. * * * I take full responsibility for my course of conduct in both of these matters. I don't want to give the impression at all that I feel that I'm not culpable for those actions. I think part of being a sole practitioner is that you do things [with] zealousness [that] pours over to stubbornness, and that's not the way to conduct yourself in the practice of law."

{¶ 22} In the end, however, the board seemed to accept respondent's contrition, adopting the panel's report, which noted:

{¶ 23} "He apologized to Ms. Basile, to counsel and the Panel 'for having * * * documentation with [his] name.' [He said,] 'It's mortifying for me to be here. I

thought I conducted myself in a more professional manner. You have seen three instances of my not having done so. I hope that, unfortunately, you do not have the cases before you where I felt I did a competent job, so I do apologize for you having to see my name on your documentation.' "

{¶ 24} Also as an aggravating factor, the board found that respondent had harmed his clients' interests, BCGD Proc.Reg. 10(B)(1)(h), although the injuries were not permanent. Basile's bankruptcy relief was at least delayed, and Spoden and Walters did not receive their money when they should have. The board also noted, however, that respondent was never paid for the criminal defense of Spoden's son, for whom he had apparently marshaled an effective defense, inasmuch as the son was sentenced to a comparatively short jail term relative to the seriousness of the crime.

{¶ 25} As mitigating, the board found that respondent had made restitution to all parties, including Basile, and was cooperative during the disciplinary proceedings. See BCGD Proc.Reg. 10(B)(2)(c) and (d). Moreover, respondent testified to his personal difficulties at the time he committed his crimes—his father had just been diagnosed with a life-threatening illness, and his marriage was unraveling. And according to nine reference letters from former clients, respondent exhibited good character and professionalism in representing them. Finally, the board found that respondent completed the terms of his sentence, including the probation, restitution, medical treatment, and service, and that his license has been under interim suspension since November 21, 2003. BCGD Proc.Reg. 10(B)(2)(f).

{¶ 26} As a sanction, the parties jointly suggested that respondent's license to practice law be suspended for six months and that he receive credit for time served since the date of our interim-suspension order. The panel recommended that respondent be suspended from the practice of law for one year with credit for time served under license suspension. The board recommended a one-year suspension with no credit for time served. Respondent filed no objections to the board's recommendation.

{¶ 27} On review, we agree that respondent violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 6–101(A)(3), 7–101(A)(1), and 7–101(A)(2), as found by the board. We further agree that a one-year suspension, without credit for the interim suspension that respondent is currently serving, is appropriate. Respondent is therefore suspended from the practice of law in Ohio for one year. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

Brzytwa, Quick & McCrystal, LLC, John Brzytwa, and Robert E. Cahill; Ann Rowland, for relator.

Mark P. Glassman, pro se.